**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

YVONNE M. SHANNON, )
)
          Plaintiff, )     Civil Action No. 12-105 Erie
)
v. )
)
CAROLYN W. COLVIN,[1] )
Acting Commissioner of Social Security, )
)
          Defendant. )

## MEMORANDUM OPINION

**MAURICE B. COHILL, JR., Senior District Judge.**

*I. Introduction*

Pending before this Court is an appeal from the final decision of the Commissioner of

Social Security ("Commissioner" or "Defendant") denying the claims of Yvonne M. Shannon

("Plaintiff" or "Claimant"), for disability insurance benefits ("DIB") and supplemental security

income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* and §

1381 *et seq.* Plaintiff argues that the decision of the administrative law judge ("ALJ") should be

reversed and the Commissioner directed to award her benefits because the ALJ's determination

is not supported by substantial evidence, and thus, she is entitled to benefits. To the contrary,

Defendant argues that the decision of the ALJ is supported by substantial evidence, and

therefore, the decision should be affirmed. The parties have filed cross motions for summary

judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

---

[1] Ms. Colvin became the Acting Commissioner of Social Security on February 14, 2013. She is automatically
substituted as the named defendant in this suit in place of Michael J. Astrue, who previously served as
Commissioner. *See* Fed.R.Civ.P. 25(d).

1

For the reasons stated below, the Court will deny the Plaintiff's Motion for Summary Judgment (ECF No. 10) and grant the Defendant's Motion for Summary Judgment (ECF No. 12), and affirm the decision of the ALJ.

## II. Procedural History

Plaintiff filed her applications on November 17, 2009, claiming disability since August 31, 2005 due to depression, emphysema, nerve damage, bronchitis, bipolar disorder, migraine headaches, and a back problem. (R. at 145-154, 178).[2] Her applications were denied (R. at 70-79), and she requested a hearing before an ALJ. (R. at 80-81). A hearing was held on June 13, 2011, wherein Plaintiff appeared and testified, and Mary Beth Kopar, an impartial vocational expert, also appeared and testified. (R. at 31-50). On July 22, 2013, the ALJ issued a written decision finding that, absent substance abuse, Plaintiff was not disabled under the Act. (R. at 12-26). Plaintiff's request for review by the Appeals Council was denied (R. at 1-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). She filed her complaint challenging the ALJ's decision, and the parties subsequently filed cross-motions for summary judgment. Accordingly, the matter has been fully briefed and is ripe for disposition.

## III. Background

### A. Medical evidence

Plaintiff began treating with Eileen Boyle, M.D., on March 11, 2008. (R. at 369). She reported a history of drug abuse, but claimed she had been "clean" for three weeks. (R. at 369).

---

[2] References to the administrative record (ECF No. 8), will be designated by the citation "(R. at ___)". Plaintiff previously filed applications for DIB and SSI on February 12, 2007 that were denied initially and by an ALJ in a decision issued September 11, 2009. (R. at 13). The Appeals Council denied review, and that decision was not appealed further. (R. at 13). In the decision that is the subject of the instant appeal, the ALJ found that the issue of disability through September 11, 2009 was precluded by *res judicata*. (R. at 13).

Plaintiff also reported a history of chronic pain since a motor vehicle accident in 2002. (R. at 369). She requested a prescription for Motrin and Flexeril. (R. at 369). Plaintiff indicated that she previously took Zoloft for depression and wanted to restart this medication. (R. at 369). Dr. Boyle prescribed Flexeril, Zoloft and Vistaril, and referred Plaintiff to a drug and alcohol worker for support in her recovery efforts. (R. at 369).

Plaintiff returned to Dr. Boyle on June 9, 2008 for a comprehensive medical examination. (R. at 358-359). Dr. Boyle reported that Plaintiff was fully oriented, with a normal mood and affect. (R. at 358). Physical examination revealed that her neck was supple, her lungs were clear, her extremities had no cyanosis or swelling, her peripheral pulses were intact, and she was neurologically intact. (R. at 358-359). Plaintiff was assessed with depression and cocaine abuse. (R. at 359). Dr. Boyle reported that Plaintiff declined treatment and expressed no desire to stop using cocaine. (R. at 359). Dr. Boyle counseled the Plaintiff with respect to nutrition, exercise, substance abuse, sexuality, injury prevention, and dental health. (R. 359). Plaintiff was to return "as needed." (R. at 359).

On August 13, 2008 Plaintiff requested a refill of Flexeril for lower back muscle spasms. (R. at 354). When treated for sinusitis on November 10, 2008, Dr. Boyle reported that Plaintiff was fully oriented with a normal mood and affect. (R. at 350). Plaintiff reported that she felt better because she no longer lived with her daughter, as that situation had been "very stressful." (R. at 351). On December 12, 2008, Plaintiff complained of sinus pressure and a sore throat. (R. at 340). On examination, Dr. Boyle reported that Plaintiff was well appearing, in no distress,

3

and fully oriented with a normal mood and affect. (R. at 340). She was diagnosed with a viral upper respiratory infection. (R. at 341).

Plaintiff's prescriptions were refilled pursuant to her telephone requests in January and February 2009. (R. at 331-337). On February 11, 2009, Plaintiff complained of diarrhea and stomach cramping. (R. at 329). On physical examination, Dr. Boyle reported that Plaintiff was well nourished, in no acute distress, and fully oriented. (R. at 329). Her bowl sounds were hyperactive, but no masses or tenderness were found. (R. at 329). Plaintiff was assessed with viral gastroenteritis. (R. at 330). When seen by Dr. Boyle on March 30, 2009, Plaintiff complained of headaches at night. (R. at 322). Plaintiff denied recent drug use, but then admitted using cocaine three days prior and suffering from chest pains while using. (R. at 322). Plaintiff reported that she was not undergoing counseling or treatment for drug and alcohol abuse. (R. at 322). She reported that Zoloft helped her depression. (R. at 322).

On examination, Dr. Boyle found Plaintiff was in no distress and was fully oriented, with a normal mood and affect. (R. at 322). Dr. Boyle recommended that Plaintiff meet with a social worker in order to determine the best place to obtain care in order to address her underlying issues of past abuse, observing that Plaintiff "freely admit[ted] that she use[d] cocaine to medicate the pain." (R. at 323). Dr. Boyle also counseled Plaintiff on the "importance of getting treatment for drug abuse" since she was at "risk for MI related to cocaine use." (R. at 323).

Plaintiff was voluntarily admitted to Forbes Regional Hospital for depression and alcohol and cocaine abuse from April 7, 2009 through April 14, 2009. (R. at 261-271). Plaintiff reported that she had "lots of manic depression and thoughts of suicide." (R. at 261). She

4

complained of a depressed mood, poor concentration, low energy, hopelessness, and pervasive

suicidal ideations. (R. at 261). Plaintiff further complained of auditory hallucinations,

nightmares, and crying spells. (R. at 261). Plaintiff described some post-traumatic stress

disorder symptoms following a sexual assault three to four years prior. (R. at 265). She reported

a long history of issues with alcohol and crack cocaine use, acknowledging that she was

"probably" an alcoholic and used crack cocaine about three days per week. (R. at 265). Plaintiff

reported that she had smoked crack cocaine "about ten times" in the prior week. (R. at 261).

On mental status examination, Plaintiff's speech had decreased volume and spontaneity,

her mood was depressed, and her affect was decreased in range. (R. at 266). She was alert and

oriented, and there was no evidence of delusional thinking. (R. at 266). Plaintiff denied having

hallucinations or suicidal thoughts, but described passive thoughts of death. (R. at 266). She

was diagnosed with major depression, probably recurrent, severe; alcohol abuse, episodic;

cocaine abuse; probable generalized anxiety disorder; and possible post-traumatic stress disorder,

residual symptoms. (R. at 266). She was assigned a Global Assessment of Functioning ("GAF")

score of 35.[3] (R. at 266). Plaintiff was started on Zoloft, and she was encouraged to abstain

from alcohol and cocaine usage. (R. at 266). She was also strongly encouraged to participate in

a 12-step program. (R. at 266). In addition to alcohol/substance abuse and depression, she was

---

[3] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 31 to 40 may have "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; …)." *Id.*

diagnosed with mild asthma and allergic rhinitis per history. (R. at 268). During her stay, Plaintiff participated in therapy, and was treated with a combination of Zoloft, Seroquel and Depakote, which she tolerated well. (R. at 269). Plaintiff was medically stable during her stay, and she was assigned a GAF score of "around 45" on discharge.[4] (R. at 269).

On May 19, 2009, Plaintiff reported that she had not seen a mental health provider since her hospitalization. (R. at 314). On June 18, 2009, Dr. Boyle completed a form entitled "Physical Capacity Evaluation", and opined that Plaintiff could stand/walk/sit for eight hours; frequently lift 11-20 pounds; use her hands and feet for repetitive movements; frequently bend; and occasionally squat, crawl and climb. (R. at 397-398). She stated that Plaintiff's diagnoses were depression/PTSD, and drug abuse. (R. at 398). She indicated that Plaintiff's onset of total disability date was March 11, 2008, her "first visit with pt." (R. at 398). Dr. Boyle opined that Plaintiff was totally disabled on a "psychiatric basis", and that she would miss more than 15 days of work a month. (R. at 398). Dr. Boyle noted that Plaintiff suffered from depression, post-traumatic stress disorder, and used cocaine to medicate for pain. (R. at 399). She further noted that Plaintiff had recently been admitted to Forbes Regional Psychiatric Unit for detoxification and questionable bipolar disorder. (R. at 399).

On June 22, 2009, Plaintiff was informed by Dr. Boyle's office that she needed to be "connected" with a psychiatrist for ongoing refills of her medication, and information regarding mental health providers was mailed to her. (R. at 312). Plaintiff failed to show for her July 13,

---

[4] Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

2009 and August 3, 2009 appointments with Dr. Boyle. (R. at 309-310). When seen by Dr. Boyle on August 7, 2009, Plaintiff complained of sinus problems. (R. at 307). She also requested a refill of her psychiatric medications. (R. at 307). On physical examination, Dr. Boyle reported that Plaintiff was well appearing, well nourished, in no acute distress, fully oriented, and had a normal mood and affect. (R. at 307). She was diagnosed with acute sinusitis and prescribed medication, and her psychiatric medications were renewed until she could be seen for her psychiatric appointment. (R. at 308).

Plaintiff failed to appear for her September 17, 2009 and September 24, 2009 appointments with Dr. Boyle. (R. at 302, 305). On September 28, 2009, Dr. Boyle performed a comprehensive medical examination. (R. at 299). Dr. Boyle reported that Plaintiff was well appearing, in no distress, was fully oriented, and had a normal mood and affect. (R. at 300). Her physical examination was normal. (R. at 300). Dr. Boyle assessed Plaintiff with bipolar disorder, and noted that she still had not established psychiatric care. (R. at 300). Plaintiff was counseled on the importance of the cessation of substance abuse. (R. at 300).

On November 13, 2009, Plaintiff complained of chills, a fever, and a sore throat. (R. at 290). Plaintiff reported that she was to begin going to Mercy Behavioral Health the following week for intake, and would be participating in group and individual therapy. (R. at 290). Dr. Boyle reported that Plaintiff was tired appearing, but in no distress. (R. at 290). Plaintiff was also fully oriented with a normal mood and affect. (R. at 290). Plaintiff was diagnosed with acute sinusitis, depression, and questionable bipolar disorder. (R. at 291).

7

In a "Report of Contact" dated January 28, 2010, Dr. Boyle clarified that Plaintiff had no diagnosis of COPD or emphysema, and that she had been prescribed Albuterol for allergies. (R. at 427). Dr. Boyle stated that when she saw Plaintiff on November 13, 2009, she did not notice any limitations in Plaintiff' range of motion, her gait and station were within normal limits, and she did not exhibit any neurological deficits. (R. at 427).

On January 28, 2010, Paul Fox, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and walk for six hours in an 8-hour workday; and sit for six hours in an 8-hour workday (R. at 420). He further opined that Plaintiff had unlimited push and/or pull ability, no postural limitations, no manipulative limitations, and no visual limitations. (R. at 421). He also found that Plaintiff should avoid concentrated exposure to extreme cold, humidity, fumes, odors, dusts, gases and poor ventilation. (R. at 422).

On February 2, 2010, Plaintiff underwent a consultative clinical psychological evaluation performed by Linda Rockey, Psy.D. (R. at 408-415). Plaintiff stated that she had difficulties with sustained walking, going up and down stairs, lifting, and bending, but she walked without an assistive device. (R. at 410). Plaintiff informed Dr. Rockey that she had been diagnosed with emphysema by Dr. Boyle, and that shingles affected her neck and back of her head, causing residual headaches and "nerve damage." (R. at 410). She further reported residual low back pain from a car accident. (R. at 410). Plaintiff indicated that she previously used alcohol significantly, and had used crack cocaine in the past. (R. at 410). She claimed that she had been substance free for the past six months (since August 2009). (R. at 410). Plaintiff reported that

8

she had never received inpatient psychiatric treatment other than treatment for drug and alcohol rehabilitation. (R. at 411). Plaintiff stated she was taking Zoloft, Neurontin, Seroquel and Depakote, but was not undergoing individual psychotherapy. (R. at 411).

On mental status examination, Dr. Rockey found Plaintiff pleasantly cooperative, with good eye contact and no evidence of psychomotor abnormalities. (R. at 411). Dr. Rockey noted that her speech was of low tone but of normal rate, and that her thoughts were coherent, logical and goal directed (R. at 411). Dr. Rockey reported that Plaintiff presented with moderate symptoms of bipolar disorder, decreased self-esteem, sadness, unresolved grief related to her mother's death three weeks prior, mild irritability, and reduced concentration and memory. (R. at 412). Plaintiff denied having any suicidal or homicidal thoughts, visual hallucinations or symptoms of paranoia. (R. at 411). Plaintiff described, however, mild symptoms of auditory hallucinations, stating that she heard her mother calling her. (R. at 412). Dr. Rockey found Plaintiff was able to recall three of three objects for immediate recall, as well as following a five, ten and twenty minute delay. (R. at 412). Her recent past and remote memory were intact. (R. at 412). Plaintiff could complete six-serial digits forward but only three-serial digits backward, which was indicative of slightly above average attention span with a "moderate+" reduction in concentration on formal testing. (R. at 412). She was able to calculate serial-sevens without error, and could accurately complete arithmetic questions of subtraction, multiplication and division, but had difficulty with addition. (R. at 412). Plaintiff's social reasoning skills on formal testing were mildly reduced, and her fund of knowledge was in the slightly below average range. (R. at 412-413). Plaintiff's insight into her difficulties was complicated by her moderate

9

symptoms of mood dysregulation, impulsivity, low frustration tolerance, sadness, unresolved grief, withdrawal, anhedonia, and decreased self-esteem. (R. at 413).

Dr. Rockey formed a diagnostic impression of, *inter alia*, bipolar disorder, mixed type, moderate+, with mild reported symptoms of auditory hallucinations which may relate to unresolved grief; and a history of polysubstance abuse, in remission for six months. (R. at 413). She assessed her with a GAF score of 55.[5] (R. at 413). She found that Plaintiff was independent with all aspects of personal hygiene and was able to perform household chores and go shopping. (R. at 413). Plaintiff maintained a close relationship with her youngest daughter, but did not maintain close contact with the rest of her family. (R. at 414). Plaintiff did not participate in any social-leisure activities. (R. at 414).

Dr. Rockey noted that Plaintiff's prognosis in obtaining and maintaining gainful employment was "complicated" by her chronic low back pain with difficulties walking, ascending and descending stairs, lifting and bending, her history of emphysema, shingles and reported "nerve damage," and her moderate symptoms of bipolar disorder. (R. at 414). Dr. Rockey opined that Plaintiff would have significant difficulty maintaining consistent employment on a daily basis, interacting effectively with others, comprehending and completing complex work-related tasks, meeting deadlines, and adapting to changes in the work setting. (R. at 414). She further opined that Plaintiff had no restriction in her ability to understand, remember and carry out short and simple instructions. (R. at 416). She had a moderate

---

[5] Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

limitation in her ability to understand, remember, and carry out detailed instructions and make judgments on simple work-related decisions. (R. at 416). Plaintiff had a "moderate+" limitation in her ability to interact appropriately with the public, supervisors and co-workers. (R. at 416). Finally, Dr. Rockey found Plaintiff had a marked limitation in her ability to respond appropriately to work pressures and changes. (R. at 416).

On March 18, 2010, Richard Heil, Ph.D., a state agency reviewing psychologist, reviewed the psychiatric evidence of record and determined that Plaintiff had bipolar I disorder, mixed, and a substance abuse disorder. (R. at 441, 446). He found that Plaintiff had mild limitations in completing activities of daily living, moderate difficulties in maintaining concentration, persistence or pace, and moderate difficulties in maintaining social functioning (R. at 448). Dr. Heil completed a Mental Residual Functional Capacity Assessment form, and opined that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures; understand, remember and carry out very short, simple instructions; sustain an ordinary routine; work in coordination with others; make simple work-related decisions; ask simple questions; get along with co-workers; maintain socially appropriate behavior; respond appropriately to changes in the work setting; avoid normal hazards; travel and use public transportation; and set realistic goals (R. at 434-435). He further found that Plaintiff was only moderately limited in all other work-related areas (R. at 434-435).

Dr. Heil found that Plaintiff's basic memory processes were intact, and that she could perform simple, routine, repetitive work in a stable environment. (R. at 436). He further found that Plaintiff was able to maintain concentration and attention for extended periods, maintain

11

regular attendance, and exhibit socially appropriate behavior. (R. at 436). Dr. Heil found Dr. Rockey's assessment regarding Plaintiff's abilities were overestimated in severity and inconsistent with the medical and non-medical evidence, which rendered it less persuasive. (R. at 436). Accordingly, he found Dr. Rockey's assessment only partially consistent, and concluded that Plaintiff was able to meet the basic mental demands of competitive work despite the limitations resulting from her impairments. (R. at 436-437).

Plaintiff was assigned to participate in the Mercy Behavioral Health Alcohol or other Drug Partial Hospitalization program beginning on April 27, 2010. (R. at 458). She was diagnosed with polysubstance dependence and bipolar mood disorder. (R. at 458).

On May 7, 2010, Plaintiff underwent a psychiatric evaluation performed by Tracy Javaherian, M.D. at Mercy. (R. at 519-520). Plaintiff reported that she was currently in the partial hospitalization program. (R. at 519). She reported a history of crack cocaine and alcohol abuse, but claimed that she had not used since Sunday. (R. at 519). She indicated that her longest clean time in the past had been three years. (R. at 519). She indicated that she had been an inpatient at Forbes for homicidal ideations, and had been to several detoxification facilities. (R. at 519). Plaintiff complained of memory difficulties, mood difficulties, sleep difficulties, nightmares, avoidance behavior, and hypervigilance. (R. at 519). Dr. Javaherian noted that Plaintiff endorsed all nine criteria for borderline personality disorder. (R. at 519). Plaintiff further reported a history of headaches from shingles, asthma and allergies. (R. at 519). Plaintiff indicated that she was prescribed Depakote, Seroquel, Neurontin and Zoloft by her primary care physician. (R. at 519).

12

On mental status examination, Dr. Javaherian found Plaintiff cooperative with fair eye contact. (R. at 519). Her speech was somewhat vague, her mood was depressed, and her affect was tearful. (R. at 519). Dr. Javaherian found her thought form was organized, her cognition was intact, she had no suicidal or homicidal ideations, her insight was limited and her judgment was fair. (R. at 519-520). She was diagnosed with mood disorder, NOS; post-traumatic stress disorder; and rule out personality disorder, and was assigned a GAF score of 50. (R. at 519). Dr. Javaherian was unable to confirm a diagnosis of bipolar disorder. (R. at 519). Plaintiff was to continue her participation in the partial hospitalization program. (R. at 520). However, Plaintiff was discharged from the program on June 23, 2010 after attending only six days of programming. (R. at 458).

Plaintiff attended an alcohol and drug orientation on August 9, 2010 and was referred to start a Motivation and Recovery group, but she never followed through and her case was closed. (R. at 460). Plaintiff's diagnosis at that time was polysubstance dependence, unspecified, and bipolar disorder, D/O, NOS. (R. at 460). Plaintiff's prognosis was poor for long-term remission. (R. at 460).

On March 9, 2011, Plaintiff was seen by Alexandre Fleche, LSW at Mercy. (R. at 466-479). Plaintiff reported that her crack/cocaine usage was "constant" in that she used five days out of seven. (R. at 466). She reported that she last used on March 1, 2011. (R. at 466). Plaintiff reported that she had been abstinent for a three year period, from 1998 to 2001. (R. at 468). Plaintiff reported that her family was supportive of her recovery but she did not see them when using. (R. at 472). On mental status examination, Plaintiff's speech was

13

pressured/explosive, she was agitated, anxious, angry, and suspicious, but her affect, thought process, and thought content were appropriate. (R. at 474). Plaintiff reported seeing shadows, and claimed she heard ringing and beeping noises. (R. at 475). Her judgment and insight were impaired, in that she did not see her drug and alcohol use as problematic. (R. at 475). Her cognition was acceptable and her intellectual functioning was within normal limits. (R. at 475). She was assessed with post-traumatic (stress disorder), bipolar disorder, and "polysubstance", and was assigned a GAF score of 41. (R. at 478). Plaintiff was of the view that her problems were "mental" and refused to attend any drug and alcohol treatment. (R. at 478). She was referred to outpatient mental health treatment. (R. at 480-482).

In March 2011, Plaintiff began attending individual and group therapy sessions at Mercy. (R. at 480-489, 495, 498-499, 502-503, 515-517, 528). On March 16, 2011, it was reported that Plaintiff was alert, attentive and active in group therapy. (R. at 483). However, Plaintiff's mood was irritable, and she admitted using. (R. at 483). Plaintiff was encouraged to "get clean" and participate in alcohol and drug treatment. (R. at 483). On March 23, 2011, Plaintiff reported having mixed emotions and was struggling to remain clean, stating that she had been sober for one week. (R. at 486, 488). She reported difficulties managing her psychiatric symptoms and dealing with the urge to use crack. (R. at 488). However, Plaintiff refused a referral for drug and alcohol treatment. (R. at 488). Her group counselor reported that she presented with a fair mood, and assigned her a GAF score of 55. (R. at 486). Plaintiff failed to appear for her appointments on March 28, 2011, March 30, 2011, and April 5, 2011. (R. at 490, 492-493). On April 6, 2011, Plaintiff presented with a fair mood, was active in group discussion,

14

and was assessed with a GAF score of 55. (R. at 495). Plaintiff cancelled her appointment on April 8, 2011, and did not appear at her appointment on April 13, 2011. (R. at 497-498).

On April 15, 2011, Plaintiff reported that she stopped using alcohol and cocaine four months prior. (R. at 499). She reported hearing buzzing sounds, and stated she was paranoid at times. (R. at 499). Plaintiff was irritable during the session, and was interested in being referred to the Women in Addiction and Recovery Group. (R. at 499). She was assigned a GAF score of 41. (R. at 499). On April 22, 2011, Plaintiff complained about her boyfriend and that she planned on skipping Easter dinner because the holidays stopped being fun after she started using drugs. (R. at 502). Plaintiff reported that she watched television all day and was comfortable with that routine. (R. at 502). Her GAF score remained unchanged. (R. at 502).

On May 9, 2011, Plaintiff was seen by Dr. Javaherian following a "year-long hiatus." (R. at 510). Plaintiff reported that her primary care physician no longer wanted to prescribe medications. (R. at 510). Plaintiff reported that she was essentially on the same medications as the prior year, but no longer took Depakote and was on Remeron instead. (R. at 510). Plaintiff reported that her mood and sleep were "ok," and that her main complaints were headaches from shingles and a "creepy crawly" feeling at night. (R. at 510). Plaintiff had no other complaints. (R. at 510). She reported being "clean" for four months. (R. at 510). Plaintiff asked Dr. Javaherian to fill out her disability paperwork, but Dr. Javaherian did not think it was "appropriate." (R. at 510). On mental status examination, Plaintiff was cooperative, her speech unremarkable, and her mood and affect were okay/congruent. (R. at 510). Her thoughts were organized and she had no suicidal intent or delusions. (R. at 510). No abnormalities were noted

15

in Plaintiff's perception, her cognition was fair, and her insight/judgment was limited/fair. (R. at 510). Plaintiff denied any medication side effects. (R. at 510). Dr. Javaherian adjusted Plaintiff's medication regimen. (R. at 510).

On May 11, 2011, Frances Irvin, M.D., completed a medical source statement regarding Plaintiff's ability to perform work-related physical activities. (R. at 530-531). Dr. Irvin opined that Plaintiff could occasionally lift ten pounds, stand and walk for less than two hours, and sit for less than six hours in an eight hour workday. (R. at 530). She further opined that Plaintiff could occasionally engage in postural activities, and should avoid exposure to poor ventilation, heights, temperature extremes, dust, fumes, odors, gases and humidity. (R. at 531). Dr. Irvin stated that Plaintiff suffered from moderate chronic pain syndrome due to back pain and hand degenerative joint disease. (R. at 532). She opined that, due to pain, Plaintiff had marked restrictions in activities of daily living and in maintaining social functioning. (R. at 532). She further opined that Plaintiff had deficiencies of concentration, persistence or pace resulting in frequent failure or complete tasks in a timely manner. (R. at 532).

On May 20, 2011, Plaintiff reported that she no longer wanted to attend the Women's Recovery Group and requested that she be switched to the Depression/Anxiety Group. (R. at 515). Plaintiff denied any alcohol or cocaine usage. (R. at 515).

### B. Administrative Hearing

Plaintiff and Mary Beth Kopar, a vocational expert, testified at the hearing held by the ALJ on June 13, 2011. (R. at 31-50). Plaintiff testified that she previously worked as a nurse's aide beginning in 1985, and became certified in 1992. (R. at 37). Plaintiff stated that she

16

stopped working in August 2005 due to back pain and depression. (R. at 38). Plaintiff indicated that she permanently damaged her back in a car accident in 1993 or 1994. (R. at 38). She testified that her symptoms of depression were isolation and crying spells. (R. at 38). Plaintiff indicated that she had been a victim of a sexual assault and had been beaten in the 1990's. (R. at 38). Plaintiff testified that she began treatment at Mercy Behavioral Health in 2010 after waiting for an appointment. (R. at 38-39). She indicated that she saw a therapist every one or two weeks, and saw a psychiatrist every three weeks. (R. at 39). Plaintiff testified that her prescribed medications included Neurontin, Depakote, and Seroquel. (R. at 40). She claimed that her medications caused her legs to ache and her mouth to "twitch." (R. at 41).

Plaintiff testified that she also saw Dr. Irvin, her primary care physician, "about" every three weeks. (R. at 40). Plaintiff claimed that she had been diagnosed with restless leg syndrome that interfered with her sleep. (R. at 41). Plaintiff further claimed that the Neurontin and Depakote were prescribed for her symptoms of restless leg syndrome. (R. at 41). Plaintiff testified that she had difficulty being in crowds and kept herself secluded. (R. at 42-43). Plaintiff stated that she was limited in her ability to do things due to her backache and depression. (R. at 42). Plaintiff also indicated that she suffered from headaches three times a month. (R. at 43).

Plaintiff testified that she lived alone, was able to grocery shop with her daughter, occasionally cooked, and was able to clean her house. (R. at 42-44). On a daily basis, Plaintiff indicated that she usually awoke in the afternoon, stayed home until 7:00 p.m. until she left to visit one of her girlfriends, and returned home at approximately 10:00 or 11:00 p.m. (R. at 43-

17

44). She stated that she could stand for 15 to 45 minutes "before falling," and sit for 20 to 30 minutes before needing to check her house for fear that the individual who assaulted her had gained entry. (R. at 44). Plaintiff further stated that she could walk for one block without fear of falling down, claiming that she fell approximately three times a week. (R. at 45).

Plaintiff testified that she suffered from visual and auditory hallucinations since 2009. (R. at 44-45). Plaintiff further testified that her "clean" date was three months prior, in late February or March of 2011, when she last drank alcohol or smoked marijuana. (R. at 46). Plaintiff stated that she drank to ease her pain, acknowledging that she drank a fifth and smoked two joints per week. (R. at 46). Plaintiff stated that the last time she used crack cocaine was one year prior (June 2010). (R. at 46-47). She testified that she did not attend NA or AA, but was waiting to get into a group for trauma and depression. (R. at 46).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was able to perform light work, but would have to avoid concentrated exposures to fumes, odors, dusts, and gases, and avoid work involving anything more than simple decision making. (R. at 47-48). The hypothetical individual would also need to be isolated from the public, with only occasional supervision, performing work free of fast-paced production requirements. (R. at 48). The vocational expert testified that such an individual could perform the jobs of a cleaner, marker, and sorter. (R. at 48). The vocational expert further testified that there would be no jobs available if such hypothetical individual would miss five or more days a month due to anxiety, depression, and polysubstance abuse. (R. at 49).

18

*IV. Standard of Review*

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Richardson v. Parales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion ... so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

19

## V. Discussion[6]

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) with 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that the Plaintiff met the disability insured status requirements of the Act through December 31, 2010 (R. at 12). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition. 20 C.F.R. §§ 404.1520; 416.920. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the

---

[6] Plaintiff does not challenge the ALJ's findings with respect to her physical impairments. We therefore confine our discussion to her mental impairments.

medical evidence of the claimant's impairment or combination of impairments meets or equals

the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's

impairments prevent him from performing his past relevant work; and (5) if the claimant is

incapable of performing his past relevant work, whether he can perform any other work which

exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v.*

*Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). If the claimant is

determined to be unable to resume previous employment, the burden shifts to the Commissioner

(Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work

experience, he or she is able to perform substantial gainful activity in jobs available in the

national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

In the case of an individual suffering from alcoholism or drug addiction however, the Act

provides that "[a]n individual shall not be considered to be disabled for purposes of this

subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing

factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C.

§§ 423(d)(2)(c), 1382c(a)(3)(J). According to 20 C.F.R. §§ 404.1535 and 416.935, the "key

factor" in making the above conclusion is determining whether a claimant would continue to be

disabled if he or she ceased to use drugs and/or alcohol. *See also Nomes v. Astrue*, 2010 WL

3155507 at *7-8 (W.D.Pa. 2010) (quoting *Warren v. Barnhart*, 2005 WL 1491012 at *10

(E.D.Pa. 2005)); *Plater v. Astrue*, 2013 WL 6252979 at *10 (W.D.Pa. 2013).

Side effects of drug and alcohol abuse, and any impact on other existing impairments,

must be isolated so that the remaining limitations may be assessed. *Social Security Ruling*

21

("*SSR*") 13-2p.; Titles II & XVI: Evaluating Cases Involving Drug Addiction & Alcoholism (DAA), 2013 WL 621536, Docket No. SSA-2012-0006 (S.S.A. Feb. 20, 2013).[7] It is the ALJ's responsibility to assess the impact of the remaining limitations on a claimant's ability to work. *Id.* If it is not possible to distinguish between the limitations created by drug or alcohol abuse and the claimant's other impairments, the ALJ must find that drug or alcohol abuse is not a contributing factor material to disability. *Id.* This "materiality finding must be based on medical evidence, and not simply on pure speculation about the effects that drug and alcohol abuse have on a claimant's ability to work." *Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 430 (W.D.Pa. 2010) (citing *Sklenar v. Barnhart*, 195 F. Supp. 2d 696, 699-706 (W.D.Pa. 2002)).

Here, the ALJ initially determined, at steps two and three of the sequential analysis, that Plaintiff had severe impairments including residuals of a motor vehicle accident including chronic back pain, bipolar disorder, depressive disorder, and post-traumatic stress disorder, but that these impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404 Subpt. P, App. 1. (R. at 15). Despite her impairments, the ALJ found that she had the residual functional capacity ("RFC")[8] to perform light work, but must avoid exposure to fumes, odors, dusts, and gases, avoid work involving more than simple decisionmaking, and be

---

[7] The Court acknowledges that the ALJ could not have relied on this Ruling in rendering her decision on July 22, 2011, as it did not become effective until March 22, 2013. However, this Ruling expressly makes obsolete Emergency Message 96200, which was an internal policy that provided guidance to SSA employees tasked with processing claims for benefits, and which provided for similar delineation in accordance with the regulations at 20 C.F.R. §§ 404.1535 and 416.935 ("How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.").

[8] "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121.

isolated from the public. (R. at 16). The ALJ further found that she could have only occasional supervision and interaction with co-workers, and that her work must be free of fast-paced production requirements. (R. at 16). However, the ALJ found that Plaintiff would also miss five or more days per month due to symptomatology exacerbated by substance abuse. (R. at 16). The ALJ concluded that with her substance abuse disorders, Plaintiff was unable to make a successful vocational adjustment to work and was therefore disabled. (R. at 17).

The ALJ next found that Plaintiff would continue to have the same severe impairments even if she stopped her substance use, but that she did not meet a listing. (R. at 17). The ALJ found that absent such substance abuse, Plaintiff would have the residual functional capacity to perform light work, but must avoid exposure to fumes, odors, dusts, and gases, avoid work involving more than simple decisionmaking, and be isolated from the public. (R. at 18-19). The ALJ further found that she could have only occasional supervision and interaction with co-workers, and that her work must be free of fast-paced production requirements. (R. at 19). Absent Plaintiff's substance addiction, the ALJ determined that the functional limitations which resulted from her remaining severe impairments did not preclude her from performing work that existed in the national economy. (R. at 19). Accordingly, the ALJ concluded that Plaintiff's substance abuse was a contributing factor material to the disability determination and therefore found her ineligible for benefits. (R. at 24-26). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff first argues that the ALJ's conclusion that her substance abuse was a contributing factor material to a finding of disability was not supported by substantial evidence

23

since it did "not appear that any physician found [Plaintiff's drug and alcohol abuse] to be material." *See* (ECF No. 11 at 12). However, the Third Circuit Court of Appeals has specifically rejected the contention that expert opinion evidence is necessary in order to establish materiality. *See McGill v. Comm'r of Soc. Sec.*, 288 Fed. Appx. 50, 53 (3d Cir. 2008) (holding that there is no requirement in the statute, implementing regulations, or internal guidelines that the materiality finding must be based on expert psychiatric opinion evidence); *see also Gaines v. Astrue,* 2011 WL 5555629 at *6 (E.D.Pa.) (expert psychiatric opinion evidence is not required in determining whether drug and alcohol abuse is material to finding of disability), *report and recommendation adopted by* 2011 WL 5555841 (E.D.Pa. 2011); *Lawrence v. Astrue*, 2010 WL 545880 at *7 (W.D.Pa. 2010) (ALJ entitled to make a well-supported finding of materiality even in the absence of psychiatric opinion evidence); *Crawford v. Astrue*, 2009 WL 1033611 at *7 (E.D.Pa. 2009) (materiality finding need only rest on substantial evidence).

More broadly, we find substantial evidence supports the ALJ's conclusion that Plaintiff's substance abuse was a contributing factor material to a finding of disability. The only difference between the RFC determination with and without considering her substance abuse was the days per month Plaintiff would be expected to miss. (R. at 16, 19). In concluding that Plaintiff's substance abuse was a contributing factor material, the ALJ relied, in part, on the report of Dr. Heil, the state agency reviewing psychologist, who concluded that Plaintiff's psychological impairments did not produce functional limitations at a debilitating level. (R. at 23). Dr. Heil found Plaintiff's basic memory processes were intact, and that she could perform simple, routine, repetitive work in a stable environment. (R. at 436). He further found that Plaintiff was able to

maintain concentration and attention for extended periods, maintain regular attendance, and exhibit socially appropriate behavior. (R. at 436). Dr. Heil concluded that Plaintiff was able to meet the demands of competitive work despite the limitations resulting from her mental impairments. (R. at 436-437).

The ALJ also observed that Dr. Boyle's treatment notes indicated that Plaintiff was treated for primarily routine and transitory complaints, which generally resolved with appropriate treatment. (R. at 21). In this regard, these treatment notes reveal an absence of mental health complaints between July 2008 and March 2009. In November and December of 2008, Dr. Boyle found Plaintiff was fully oriented with a normal mood and affect. (R. at 340, 350). There was no mention of Plaintiff's mental impairments in February 2009 (R. at 329), and by March 2009, Plaintiff reported that Zoloft helped with her depression. (R. at 322). At this office visit, Dr. Boyle found Plaintiff had a normal mood and affect, although she advised Plaintiff on the importance of getting treatment for drug abuse. (R. at 323).

The ALJ further recognized that Plaintiff had struggled for years with substance abuse issues, and although she had not had many long periods of sobriety, she nonetheless responded well to treatment during the short periods during which she was free of drugs and alcohol. (R. at 23). The ALJ noted that during her hospitalization, she appeared intelligent, articulate, and demonstrated insight for the need to maintain sobriety. (R. at 23). The record reveals that the Plaintiff's hospitalization for suicidal ideations was largely attributable to her excessive cocaine usage (R. at 261), and her discharge summary showed that she participated in therapy, was stable during her stay, and tolerated her psychiatric medications "well." (R. at 269). Following this

25

period of hospitalization, the record reflects that when Plaintiff reported she was not abusing substances, her symptoms improved. When seen by Dr. Boyle in June 2009, September 2009, and November 2009, Dr. Boyle refilled her psychiatric medications and reported that Plaintiff's mood and affect were normal. (R. at 290, 299, 307).

The ALJ further found that Plaintiff's substance abuse exacerbated her condition. (R. at 24). Plaintiff's mental health treatment records reflect that when she was initially evaluated by Dr. Javaherian in May 2010, she was tearful with a depressed mood, and also had limited insight. (R. at 519). Plaintiff acknowledged however, that she had recently used cocaine the previous Sunday. (R. at 519). In March 2011, Ms. Fleche found Plaintiff agitated, anxious, angry, and suspicious, and her judgment and insight were impaired. (R. at 474-475). Plaintiff admitted however, to "constant" cocaine usage. (R. at 466). Plaintiff's mood was reported as irritable in a therapy session, but she admitted using. (R. at 483). Following a year-long hiatus in treatment, Plaintiff reported to Dr. Javaherian in May 2011 that she had been "clean" for four months. (R. at 510). Dr. Javaherian reported that Plaintiff's mood and sleep were within normal limits, she was cooperative, had no delusions, her speech was unremarkable, and her mood and affect were okay/congruent. (R. at 510). Dr. Javaherian declined to complete Plaintiff's disability paperwork. (R. at 510).

Plaintiff relies on the assessments of Dr. Boyle and Dr. Rockey in support of her contention that even in the absence of substance abuse, her mental impairments precluded her from working. Dr. Boyle was Plaintiff's treating physician, and generally, "[t]reating physician's reports should be accorded great weight, especially 'when their opinions reflect

26

expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)). A treating physician's opinion may be rejected, however, on the basis of contradictory medical evidence, or may be accorded less weight depending upon the extent to which a supporting explanation is provided for the opinion. *Id.* An ALJ may also assign diminished weight to a treating physician's opinion if it is beyond the physician's area of expertise. *See* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). In addition, an ALJ is not required to give any special significance to a physician's opinion that a claimant is unable to work, since it is the Commissioner's responsibility for determining whether a claimant meets the statutory definition of disability. *See* 20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability.").

Here, the ALJ reviewed and discussed the opinion evidence, and explained why he discredited the opinion of Dr. Boyle. The ALJ observed that her assessment contained the notation that Plaintiff used "cocaine to medicate for pain," in addition to her diagnosis of depression and post-traumatic stress disorder. (R. at 21). The ALJ also found Dr. Boyle's assessment was inconsistent with the remainder of the evidence, observing that her care of Plaintiff had been generally routine and conservative in nature, as discussed above. (R. at 25). The ALJ further explained that Dr. Boyle's opinion was outside her area of expertise. (R. at 25).

27

The ALJ also found Dr. Boyle's opinion was on an issue reserved to the Commissioner. (R. at 25).

The ALJ similarly discredited Dr. Rockey's opinion.[9] The ALJ observed that Dr. Rockey's report offered little in the way of clinical findings in support of her opinion. (R. at 25). The ALJ also found Dr. Rockey's narrative summary was inconsistent with her ultimate conclusions, noting that Dr. Rockey found Plaintiff interacted well throughout the interview and demonstrated no more than moderate deficits in areas tested. (R. at 25). Finally, like Dr. Boyle's opinion, the ALJ noted that it was on an issue reserved to the Commissioner. (R. at 25). The ALJ adequately articulated appropriate reasons for discrediting the opinions of Dr. Boyle and Dr. Rockey, and his findings in this regard are supported by substantial evidence.

In sum, we find that the ALJ thoroughly discussed the Plaintiff's functional limitations while abusing substances and while abstinent, and the ALJ's conclusion that her substance abuse was a contributing factor material to a finding of disability is supported by substantial evidence.

The Court further rejects the Plaintiff's argument that the ALJ erred in his credibility assessment. An ALJ must consider subjective complaints by a claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 20 C.F.R. §§ 404.1529(a), 416.929(a). Such other evidence includes the claimant's own statements, the claimant's daily activities, the treatment and

---

[9] As the ALJ recognized (R. at 24-25), Dr. Rockey was not a treating physician, and therefore the treating physician rule does not apply to a consulting physician's opinion. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). The Commissioner's regulations provide, however, that the ALJ must consider the extent to which the opinion is supported by a logical explanation, the degree the medical source's specialization in a relevant field, and the extent to which the source's opinion is consistent with the entirety of the evidence. *See generally* 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).

medication the claimant has received, any statements by treating and examining physicians or psychologists, and any other relevant evidence in the case record. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); *SSR* 96-7p, 1996 WL 374186 at *2. The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *See Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983).

The ALJ concluded that while Plaintiff suffered from some limitations due to her impairments, her testimony was not credible to the extent it precluded any work activity. (R. at 23). In making this determination, the ALJ found that Plaintiff's claimed limitations were inconsistent with the objective medical evidence, treatment regimen and the evaluations of various examining and treating medical sources, as discussed above. (R. at 23). The ALJ noted that despite evidence that Plaintiff had lived a "rather troubled life," the documentary evidence suggested a pattern of exaggeration of symptoms and functional limitations not supported by the Plaintiff's actual mental condition. (R. at 23). The ALJ further noted that Plaintiff's medical records reflected that she had ongoing problems with substance abuse for many years, and on many occasions stated that her abuse was in remission. (R. at 24). The ALJ observed however, that Plaintiff testified at the hearing that her remission was of recent origin, and the ALJ was of the view that this testimony indicated that her earlier comments were either false, or representative of only short periods of remission. (R. at 24). All of these findings are supported by substantial evidence and we find no error in the ALJ's credibility determination.

29

Plaintiff further argues that the ALJ failed to make an individualized assessment of her ability to cope with stress contrary to the requirements of *SSR* 85-15. See (ECF No. 11 at 14). *SSR* 85-15 provides that a claimant's reaction to the demands of work is "highly individualized," and a mentally impaired claimant may have difficulty meeting the requirements of even "low-stress" jobs. *SSR* 85-15, 1985 WL 56857 at *6. Any impairment-related limitations created by an individual's responses to the demands of work "must be reflected in the RFC assessment." *Id.* We find Plaintiff's contention in this regard without merit, since the ALJ specifically accounted for her individual limitations by restricting her to no more than simple decisionmaking in a job that is free of fast-paced production requirements. (R. at 19). The ALJ therefore complied with the dictates of *SSR* 85-15.

Finally, Plaintiff challenges the ALJ's reliance on the vocational expert's testimony since she failed to identify the specific Dictionary of Occupational Titles ("DOT") position numbers for the position titles to which she testified. *See* (ECF No. 11 at 15). This argument merits little discussion, since there is "no legal basis for [the plaintiff's] argument that 'if the claimant is to adequately test the accuracy of the VE testimony, the DOT numbers must be available.'" *Irelan v. Barnhart*, 82 Fed. Appx. 66, 72 (3d Cir. 2003); *see also Haas v. Barnhart*, 91 Fed. Appx. 942, 948 (5th Cir. 2004) (rejecting plaintiff's argument noting plaintiff "cites no support for his claim that the DOT numbers for positions identified by the VE must be given"); *Strong v. Comm'r of Soc. Sec.*, 2013 WL 5671267 at *6 (W.D.Pa. 2013) (observing that the failure of the VE to provide DOT numbers was not, "in and of itself," error); *Mistick v. Colvin*, 2013 WL 5288261 at *3 (W.D.Pa. 2013) ("There is no case law suggesting that a vocational expert is required to

30

provide DOT numbers in support of his claim of DOT-consistency."); *Nahory v. Colvin*, 2013 WL 3943512 at *3 (W.D.Pa. 2013) (rejecting plaintiff's argument that VE was required to provide the specific DOT numbers of the jobs to which he referred in order for the ALJ to determine whether a conflict existed, noting that *SSR* 00-04p did not require that level of specificity). Moreover, Plaintiff has not shown "that the vocational expert did not account for the possibility that Plaintiff could not engage in some jobs within the elicited occupational categories when [she] provided the numbers." *Mistick*, 2013 WL 5288261 at *3. We therefore find no error in this regard.

## V. CONCLUSION

For the reasons discussed above, we conclude that there is substantial evidence existing in the record to support the Commissioner's decision that the Plaintiff is not disabled, and therefore, the Plaintiff's Motion for Summary Judgment (ECF No. 10) is denied. Defendant's Motion for Summary Judgment (ECF No. 12) is granted and the decision of the ALJ is affirmed.

An appropriate Order follows.

Maurice B. Cohill, Jr.
Senior United States District Court Judge

Date: January 22, 2014

31